IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| COLLETTE FIKES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:03-CV-1106-WKW |
| | ) (WO) |
| ALABAMA DEPARTMENT OF YOUTH | ) |
| SERVICES, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the defendant's renewed Motion for Summary Judgment (Doc. # 117). For reasons to be discussed, the court finds that the Motion for Summary Judgment is due to be granted.

### I. FACTS AND PROCEDURAL HISTORY

*A.  Facts*

The facts contained in the parties' evidentiary submissions, viewed in a light most favorable to the non-movant,[1] show the following:[2]

---

[1] On March 8, 2005, the court entered an order outlining its understanding of the claims alleged by the plaintiff and ordering the plaintiff to "cite the document number, page, and line in the record that support ALL her allegations as to [every] incident." (Doc. # 113.) On November 7, 2005, this court issued another order in which it expressed confusion and frustration with the plaintiff's response to the March 8, 2005 order. (Doc. # 135.) The court explained that the plaintiff's response included duplicate attachments, exhibits that were not in order, and references to exhibits that were absent. As a result, the court requested another filing from the plaintiff. Plaintiff responded to the November 7, 2005 order on November 14, 2005 (Doc. # 138); however, the plaintiff again failed to provide the court with all the documents and exhibits referenced in its response. Moreover, instead of submitting an organized copy of the exhibits, the plaintiff summarized her citation method for the previously filed documents, and failed to cure the previous defects.

[2] Omitted from the facts are fifteen letters of complaint written by the plaintiff to G. Wayne Booker, Administrator of Institutional Services; Nancy Moody, Superintendent; John Rickicki and Walter Wood, Executive Directors; and Lula Bell at the EEOC. These letters are addressed in the court's analysis.

Plaintiff began working with the Alabama Department of Youth Services ("DYS") in 1993 at the Thomasville facility. She was employed as a Youth Services Aide until her termination in 2003. Her position is sometimes referred to as dorm staff. Plaintiff's job required her physical presence at the facility. Plaintiff's primary responsibilities included constant observation and supervision of delinquent youth committed to state custody ("students") and completing various forms, such as logbooks, bed check sheets, and shift change reports. The logbooks and bed check sheets were to be filled out with regularity, normally "every thirty minutes" and in chronological order. (Fikes Dep. 136:4, 143:2-8.) As a staff member she was required to attend mandatory staff meetings unless excused in advance by a supervisor or the superintendent. (Bryant Dep. 7:22-8:6.) Absence from a mandatory staff meeting without permission is an unexcused absence. Plaintiff's well-documented work history is based upon these basic job duties.[3]

On April 16, 1995, the plaintiff is alleged to have left the facility without authorization. Thereafter, a letter of warning was issued and a disciplinary hearing was held on May 1, 1995, to address leave procedures and the plaintiff's violation thereof. On July 17, 1995, the plaintiff failed to report to work and her supervisor, Nancy Moody,[4] a white female, issued an official letter of discipline.

On February 24, 1996, Ms. Moody claims that the plaintiff was sleeping on duty. Therefore, she issue the plaintiff a letter of reprimand.

---

[3] It is recognized that an employment history as long and dynamic as the plaintiff's must be viewed comprehensively. Therefore, employment history not directly in dispute is included as relevant to the plaintiff's claims.

[4] Nancy Moody was later promoted to superintendent.

On September 16, 1998, the plaintiff's supervisor, Carmen Archie, an African-American female, issued a memorandum to the plaintiff regarding the plaintiff's abandonment of her work station before completing assigned duty. Two months later, on November 12, 1998, the plaintiff appeared to be asleep again, resulting in her failure to supervise students. Nancy Moody again issued an official letter of reprimand.

On May 5, 1999, the plaintiff was involved in a disagreement with Business Manager Kaye Gaddy, after which Mrs. Gaddy filed a complaint with Nancy Moody. It is alleged that Mrs. Gaddy was unable to get the plaintiff to sign necessary paperwork and that Mrs. Gaddy perceived the plaintiff as uncooperative and rude. Nancy Moody issued a letter of instruction to the plaintiff regarding the incident with Ms. Gaddy. Plaintiff argues that she "normally play[ed]" with Mrs. Gaddy and Mrs. Gaddy did not respond as expected, but offers no evidence that the incident did not happen. (Fikes Dep. 115:1-116:22.)

On January 4, 2000, due to a failure to initial a status report, the plaintiff received a formal warning from Nancy Moody. On January 21, 2000, in response to absences on January 14 and 15, the plaintiff's supervisor, Alvin Rowell, an African-American male, issued a Letter of Instruction to the plaintiff requesting that she provide a doctor's excuse for all future sick leave. On February 14, 2000, the plaintiff was further counselled regarding the notice required for sick leave. Subsequently, on the morning of February 17, 2000, the plaintiff was away from the facility on a trip to "the store." Although the plaintiff signed herself out, it is undisputed that she signed herself back in on the same line on which she signed herself out, thus failing to maintain the chronological integrity of the log book. (*Id*. 136:6-144:9.) Mr. Rowell issued a formal letter of reprimand for violation of the leave procedure and falsification of documentation on February 17, 2000. Within

days, on February 28, 2000, the plaintiff received a written reprimand from her supervisor, John Davis, African-American male, for logging out of the facility without being relieved of her duty and for doing so without her supervisor's consent. The superintendent, Nancy Moody, issued a reprimand for the February 28, 2000, incident. On March 10, 2000, the plaintiff received a memorandum from Mr. Rowell regarding her failure to attend mandatory training on March 7, 2000. Shortly thereafter, on September 8, 2000, the plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging race and sex discrimination.

On June 1, 2001, the plaintiff was granted a merit pay raise. On July 14, 2001, Cornelius Bryant, African-American male, was hired as the new superintendent. On September 11, 2001, the EEOC issued an affirmative determination regarding the plaintiff's claim and invited DYS to join in informal methods of conciliation. On August 27, 2001, after discussion with the plaintiff, Mr. Bryant removed the requirement that the plaintiff provide a doctor's excuse to support a sick leave request. On November 5, 2001, the EEOC determined that efforts to conciliate the matter were unsuccessful and the case should be forwarded to the legal unit for litigation review and referral to the Department of Justice. Four days later, the plaintiff missed a mandatory staff meeting without excuse. Consequently, on November 20, 2001, the plaintiff received a memorandum from Mr. Bryant regarding her failure to attend the November 9, 2001 staff meeting. In the memorandum, Mr. Bryant warned the plaintiff that future occurrences would result in stronger discipline.

On January 16, 2002, the plaintiff was excused from attending a mandatory staff meeting. On February 13, 2002, the plaintiff missed a mandatory staff meeting without excuse. Plaintiff requested, and apparently received, sick leave to avoid mandatory training on May 22, 2002. Plaintiff also received sick leave for May 23. After Mr. Gantt, the plaintiff's shift supervisor,

initially extended sick leave for May 24, Mr. Gantt immediately called the plaintiff back (on May 22) and left a message on the plaintiff's answering machine. Mr. Gantt's message instructed the plaintiff that she was expected to work on May 24. Plaintiff did not return the call, request sick leave for May 24, or come to work on May 24. Plaintiff contends that these actions are permissible because May 24 was originally scheduled as an off day. Plaintiff was issued another reprimand regarding leave procedures. On July 15, 2002, the plaintiff missed another mandatory staff meeting without excuse. On October 31, 2002, the plaintiff was denied sick leave, and announced her refusal to work that night (indeed, she did not report to work that night). Accordingly, the plaintiff was reprimanded by Mr. Bryant on November 7, 2002. On November 18, 2002, the plaintiff missed a mandatory staff meeting without excuse and was admittedly insubordinate. Thus, on November 18, 2002, Mr. Bryant recommended the plaintiff's termination based upon insubordination and failure to attend staff meetings. A hearing regarding Mr. Bryant's recommendation for termination was held on December 10, 2002. However, Jan Grant, Assistant Administrative Director of DYS, recommended that the plaintiff get another chance. Rather than terminating the plaintiff, Walter Wood, Executive Director of DYS, suspended her.[5] On December 13, 2002, Mr. Bryant issued a written reprimand to the plaintiff for relaxing in a classroom instead of monitoring the dorm and for forging the log books and bed check, an allegation that the plaintiff disputes. A hearing was scheduled for February 18, 2003.

---

[5] The Executive Director of DYS is the only person who has authority to suspend or terminate a DYS employee. *See* Ala. Code § 44-1-21 (1975).

Prior to the hearing scheduled for February 18, 2003, the plaintiff filed another EEOC complaint, this time alleging that she had been retaliated against since May 15, 2002. As a result of the February 18, 2003 hearing, the plaintiff was terminated effective February 28, 2003.

### B.  *Procedural History*

Plaintiff's original Complaint (Doc. # 1), filed on November 12, 2003, was amended on multiple occasions. On May 20, 2004, Defendants filed a Motion to Dismiss Third Amended Complaint (Doc. # 32), which was granted in part and denied in part on September 14, 2004 (Doc. #46). The order dismissed all of the plaintiff's claims except the Title VII claims filed against DYS. DYS filed a Motion for Summary Judgment and Brief in Support (Doc. # 56) on December 3, 2004. On March 8, 2005, the court issued an order (Doc. # 113) outlining the issues and requested that both parties respond to the March 8, 2005 order. DYS responded with a renewed Motion for Summary Judgment filed on April 6, 2005 (Doc. # 117). Plaintiff filed a response to DYS's motions for summary judgment (Doc. #121) and a Motion to Compel Clerk to Release Original Documents (Doc. # 137). The court denied the motion to compel by order dated March 22, 2007 (Doc. # 141).

## II.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties contest neither personal jurisdiction nor venue.

## III.  SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### IV.   DISCUSSION

The court's analysis separates the plaintiff's claims regarding discipline and her claims regarding termination. At the outset, it should be noted that this court shares the sentiments of Judge Thompson expressed in his November 7, 2005 order in this case: "The court will not dig through

Fikes's jumbled submissions in what may be a fruitless search for record evidence that demonstrates that a genuine issue of material fact exists." (Doc. #135, at 3-4.)  Nevertheless, the court painstakingly attempted to assemble a summary of factual allegations that had potential for being at issue.  That effort yielded nineteen instances or combinations of instances, spanning a three year period, about which the plaintiff complains.  These included seven reprimands, four leaves without pay, two denials of training, two recommendations of termination, one poor performance appraisal, one allegedly unfair requirement of a doctor's excuse to be absent from work, one suspension, and one termination.  Notably, these instances did *not* include numerous other disciplinary actions against the plaintiff that occurred prior to March 12, 2000.[6]  The plaintiff's disciplinary journey left a trail of investigations and hearings in its wake – five since March 2000, with the final one resulting in her termination in February 2003.  Plaintiff was terminated by Mr. Wood, the Director of DYS, but her allegations implicate a diverse group of individual supervisors and decision-makers, including African-American males, an African-American female, white males, and white females.  Mr. Wood is not implicated directly.

The ensuing discussion represents the court's best effort to sort and analyze these claims.  The March 8, 2005 order of Judge Thompson is a useful framework, though the particulars of each category have been substantially modified, but not necessarily clarified, by the plaintiff's final response (Doc. # 138) to previous orders and the defendant's renewed Motion for Summary Judgment (Doc # 117).

---

[6] Plaintiff filed her original charge of discrimination with the EEOC on September 8, 2000.  The protection of Title VII only applies to those claims of employment discrimination arising withing 180 days of the filing of an EEOC charge.  42 U.S.C. § 2000e-5(e)(1); *see also Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, __U.S. __, 127 S. Ct. 2162 (2007).  Thus, claims based on allegedly discriminatory acts that occurred prior to the 180-day benchmark (*i.e.*, March 12, 2000) are time-barred.

*A.     Discipline*

    1.     Discriminatory Discipline

Plaintiff presents circumstantial, rather than direct, evidence of discrimination. Therefore, the plaintiff's discrimination claims are governed by the analysis found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this test, the plaintiff has the initial burden of establishing a prima facie case of unlawful employment discrimination by a preponderance of the evidence. *Id*. at 802. To establish a prima facie case of discrimination under Title VII, the plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside her classification more favorably. *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1091 (11th Cir. 2004). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Only the fourth element of the prima facie case -- whether similarly situated employees were treated more favorably -- is at issue.[7] Plaintiff identifies numerous comparators and argues that similarly situated employees outside of her classifications were not disciplined for the same violations for which she was disciplined. Plaintiff has the burden of proving "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

---

[7] DYS concedes that the plaintiff is a member of a protected class and that the disciplinary reprimands from DYS were adverse employment actions.

Plaintiff points to multiple instances and co-workers in an effort to find a similarly situated employee that was treated more favorably. The court will address each instance separately.

### a. Race

#### (I) <u>James Freeman - Caucasian</u>

Plaintiff argues that Mr. Freeman, a white male, left the facility out of compliance and was not disciplined. Plaintiff offers affidavit testimony from Larry Wilson, a co-worker of the plaintiff, which states in a conclusory manner that James Freeman left the facility out of compliance and was not disciplined. The court "must focus on the actual knowledge and actions of the decision-maker." *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002). "Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989). Plaintiff does not claim that she was disciplined by the same supervisor as Freeman, and she has offered no evidence regarding the circumstances surrounding Mr. Freeman's alleged action or whether a supervisor knew of Mr. Freeman's alleged action. Plaintiff fails to demonstrate that she and Mr. Freeman were similarly situated and treated differently.

#### (ii) <u>Betty King - Caucasian</u>

In response to her February 28, 2000 reprimand from her supervisor, John Davis, for logging out before being relieved and for doing so without the consent of her supervisor, the plaintiff argues that on April 13, 2001, Betty King, a white female, did the same act but was treated more favorably. The facts show that Betty King and the plaintiff were not similarly situated. First, during the instance proffered, the plaintiff and Ms. King had different immediate supervisors and, thus, are not comparable. *See id.* Furthermore, while they may have had the same superintendent, Nancy Moody,

the plaintiff provides no evidence that Nancy Moody had any knowledge of Ms. King's conduct on April 13, 2001. *See Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent."). Second, the acts themselves were materially different. Plaintiff's shift ended and she left without the arrival of relief worker and without the consent of her supervisor. Ms. King, on the other hand, waited for relief to arrive for nearly an hour and then logged out with the consent of her immediate supervisor, Mr. Crumpton. In fact, there is some evidence to suggest that Mr. Crumpton relieved Ms. King, which would make the two situations completely inapposite. Thus, Ms. King was not similarly situated to the plaintiff.

Having failed to show that she was similarly situated to a Caucasian employee who was treated more favorably,[8] the plaintiff fails to establish a prima facie case of race discrimination. DYS's Motion for Summary Judgment with respect to the claim of discriminatory discipline based on race is due to be granted.

**b. Gender**

(I) <u>Charles Bosah - Male</u>

In response to her November 19, 2002 reprimand and suspension for missing a mandatory staff meeting, the plaintiff argues that Charles Bosah, African-American male, was similarly situated but treated more favorably. However, despite Mr. Bosah's three absences from mandatory staff

---

[8] Plaintiff states that Calvin James and James Freeman missed the November 18, 2002 staff meeting, but they were not disciplined. However, the plaintiff fails to argue that the two are similarly situated. Plaintiff's absence was an act of direct insubordination, but there is no evidence that Mr. James or Mr. Freeman acted insubordinately. *See Jones v. Besssemer Carraway med. Ctr.*, 137 F.3d 1306, 1312-13 (11th Cir. 1998), *opinion modified*, 151 F.3d 1321 (1998) (holding that although plaintiff and co-worker were both unprepared, plaintiff was terminated for being unprepared ***and*** insubordinate, so co-worker was not similarly situated).

11

meetings, he is not similarly situated to the plaintiff. Plaintiff was warned on November 20, 2001, that unexcused absences from future staff meetings would result in stronger disciplinary actions. Yet, the plaintiff proceeded to compile three more unexcused absences from staff meetings. The third absence occurred on November 18, 2002, and was accompanied by the plaintiff's insubordination to Mr. Bryant. Plaintiff provides no evidence about warnings to Mr. Bosah. Morever, the plaintiff has not shown that Mr. Bosah's third absence was coupled with insubordinate behavior as the plaintiff's third absence was. Thus, Mr. Bosah was not similarly situated to the plaintiff.

Plaintiff also argues that her discipline on December 18, 2002, which prompted the termination hearing, was discriminatory. She contends that Mr. Bosah was engaged in the same activity but was not reprimanded. From the evidence presented, the court disagrees. On the evening in question, the plaintiff was designated to supervise the students and Mr. Bosah was designated to handle laundry duty. Plaintiff allegedly told Mr. Bosah that she was going to the bathroom so that Mr. Bosah could cover her. However, Mr. Rowell claims that he found the plaintiff relaxing in a classroom while Mr. Bosah was doing the laundry. Moreover, Mr. Rowell claims that the plaintiff was then caught forging the bed check book in an effort to cover up her failure to supervise. In order to establish Mr. Bosah as a similarly situated employee, the plaintiff must demonstrate that Mr. Bosah's supervisor also witnessed Mr. Bosah not doing his job. Plaintiff provides no such evidence. Therefore, Mr. Bosah and the plaintiff were not similarly situated.

    (ii) <u>Larry Wilson - Male</u>

Plaintiff seems to argue that Larry Wilson, an African-American male, was similarly situated but was treated more favorably when he requested to be excused from mandatory staff meetings.

Plaintiff fails, however, to carry her burden of showing that they were similarly situated. Plaintiff states that when Mr. Wilson was excused from the December 20, 2002 meeting he presented the same reason that she presented when requesting to be excused from the November 18, 2002 staff meeting. Again, however, the plaintiff fails to provide evidence that Mr. Wilson had a similar pattern of skipping staff meetings and was similarly warned about stronger disciplinary actions in the future. In fact, no evidence of Mr. Wilson's attendance history, excused or otherwise, has been presented. Plaintiff, therefore, fails to establish a prima facie case of sex discrimination.

### 2. Retaliatory Discipline

Plaintiff claims that since February 2, 1999, the disciplinary actions taken against her were done in retaliation for the EEOC claim she filed and the fifteen letters of complaint she made. "To establish a prima facie case of retaliation for participating in the process of vindicating civil rights through Title VII, a plaintiff must show (1) actions protected by the statue, (2) an adverse employment action, and (3) a causal link between the protected actions and the adverse employment decision." *Hamm v. Members of Bd. of Regents of State of Fla.*, 708 F.2d 647, 654 (11th Cir. 1983). "In order to establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). A causal link may be established by showing the employee's protected activity occurred in close temporal proximity to the adverse employment action. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Goldsmith*, 996 F.2d at 1163. The defendant's

awareness of the protected expression can be established by circumstantial evidence. *Id*. If the plaintiff establishes a prima facie case, "the defendant may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Id*. "If the defendant offers legitimate reasons for the employment action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the defendant are pretextual." *Id*.

Plaintiff alleges her actions were protected by the statute, and she suffered an adverse employment action. Plaintiff provided the Court with fifteen letters of complaint, written while employed at DYS. The letters were written to executive directors, superintendents, Institutional Services, and the EEOC. Largely due to the number of reprimands in the plaintiff's file, some of these letters were written in close proximity to disciplinary actions taken against the plaintiff. Likewise, a number of these letters constitute protected activity requirement and, by inference, were within the knowledge of the individuals who reprimanded the plaintiff. The court will assume a prima facie case of retaliatory discipline.[9]

DYS has demonstrated that there are legitimate reasons for the plaintiff's disciplinary record that have no connection to her protected activities, *i.e.*, the plaintiff's poor job performance. DYS offered evidence that document the plaintiff's absences from mandatory staff meetings; the plaintiff's abuse of sick leave, both before DYS required doctor's excuses for sick leave and after DYS removed this requirement; and the plaintiff's rule infractions, such as leaving campus during

---

[9] The last two letters, which were written to Lula Bell at the EEOC in Birmingham (August 8, 2001) and to Wayne Booker, Institutional Services (September 29, 2001), were not sufficiently close in proximity to DYS's last four reprimands, which began on June 4, 2002. Nine months does not constitute close temporal proximity. *See, e.g., Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (affirming that seven months is not sufficiently close, especially where record is replete with other reasons for adverse employment actions); *Hammons v. George C. Wallace State Cmty. Coll.*, No. 05-14962, 2006 WL 655061 (11th Cir. Mar. 16, 2006) (holding that five months between protected activity and adverse employment action was not close enough to establish causal connection).

work to go to the store, forging documents, and sleeping during work. DYS argues that it did not discipline the plaintiff in retaliation for her protected activities; it disciplined the plaintiff because of her insubordination and strikingly poor work performance.

Plaintiff has not shown that DYS's proffered legitimate, non-discriminatory reasons for disciplining her are pretextual. In fact, pretext is contradicted by the evidence. Plaintiff argues that, after twenty years of employment, she did not know the rules and that, because DYS employees regularly ignored the rules, the rules were unenforceable. The evidence conclusively contradicts this assertion. Plaintiff's violations were repetitive. After most violations the plaintiff was counseled and warned. Even if the plaintiff was initially unaware of the rules and believed her actions were acceptable, she was subsequently and undeniably put on notice that her actions were inappropriate, and she was counseled as to the same. Plaintiff has not produced any credible evidence showing pretext. Therefore, the claim of retaliatory discipline fails. *See Lepera v. Cagle's, Inc.*, No. 05-11213, 2006 WL 452071 (11th Cir. Feb. 24, 2006) (affirming summary judgment in favor of employer who asserted plaintiff was fired for poor job performance because the record supported employer's non-retaliatory justification).

Accordingly, DYS's Motion for Summary Judgment motion with respect to the claim of retaliatory discipline is due to be granted.

### B.     *Termination*

####     1.     Discriminatory Termination

Plaintiff claims that she was terminated because of her race and sex. Plaintiff must prove a prima facie case of unlawful employment discrimination. The court again assumes the first three elements of a prima facie case; only the fourth element -- whether a similarly situated employee was

treated more favorably -- is at issue. Plaintiff fruitlessly attempted to establish that a similarly situated employee existed in the disciplinary realm. With respect to her termination, the plaintiff offers no new comparator evidence to support her claim. Thus, having failed to create a genuine issue of material fact as to a similarly situated employee, the plaintiff fails to establish a prima facie case of discriminatory termination based on race or sex.

      2.      <u>Retaliatory Termination</u>

Plaintiff also alleges that she was terminated in retaliation for her complaints. As discussed above, the plaintiff must show a causal connection between her protected activity and her termination.

Plaintiff's last letter of complaint was written on September 29, 2001; she was not terminated until February 23, 2003. A lapse of nearly two and one-half years negates the close temporal proximity sufficient to establish a causal link. *See, e.g., Sierminski*, 216 F.3d 945 (seven months); *Hammons*, 2006 WL 655061 (five months). Plaintiff also filed an EEOC claim alleging retaliation on February 4, 2003. However, the plaintiff's retaliatory termination claim in this case cannot be based upon her February 4, 2003 EEOC claim. First, the plaintiff has failed to show that DYS knew of this EEOC claim. Second, the reprimand leading to the plaintiff's termination was issued, and the February 18, 2003 hearing was scheduled, prior to filing of the EEOC claim. Moreover, two months earlier in December 2002, DYS held a hearing at which the plaintiff was suspended. Plaintiff cannot establish a causal connection, and even if she could, due to the plaintiff's well documented poor work history, numerous hearings, and repeated warnings, this court is compelled to agree that DYS's proffered legitimate, non-discriminatory reasons are not pretextual .

DYS's Motion for Summary Judgment with respect to the claims of discriminatory and retaliatory termination is due to be granted.

## V.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the defendant's renewed Motion for Summary Judgment (Doc. # 117) is GRANTED.  An appropriate judgment will be entered.

DONE this 11th day of June, 2007.

                                       /s/   W.  Keith Watkins
                                UNITED STATES DISTRICT JUDGE